UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | No. 5:15-cr-272 |
| | : | |
| GILBERTO RAMOS, | : | |
| Defendant. | : | |

**O P I N I O N**
Motion for Compassionate Release, ECF No. 85 - Denied

**Joseph F. Leeson, Jr.**  **October 20, 2020**
**United States District Judge**

**I.      INTRODUCTION**

Ramos, who has served less than half of his 151-month sentence for serious drug offenses, has filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) due to his asthma and the coronavirus pandemic. For the reasons set for below and after consideration of the factors set forth in 18 U.S.C. § 3553(a), because Ramos's mild asthma is not a serious medical condition to present extraordinary and compelling reasons to reduce the sentence and, further, because he presents a danger to the community if released, the Court denies the motion for compassionate release.

**II.     BACKGROUND**

Ramos pled guilty on October 20, 2015, pursuant to a plea agreement made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), to possession with intent to distribute 50 grams or more of methamphetamine within 1,000 feet of a school in violation of 21 U.S.C. § 860(a), possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1), two counts of distribution of 5 grams or more of methamphetamine in

1
102020

violation of § 841(b)(1)(A), and aiding and abetting in violation of 18 U.S.C. § 2.  On January 14, 2016, Ramos was sentenced, consistent with the parties' recommendation, to 151 months imprisonment,[1] 10 years supervised release, a $25,000 fine, and a $300 special assessment.

Ramos has filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  *See* ECF No. 85 (attaching limited medical records).  He asks the Court to modify his sentence and place him on home confinement because his condition of Acute Chronic Asthma, in conjunction with the prison's poor ventilation, poor sanitation, and insufficient medical capacity, places him at a high risk for serious complications and/or death if he contracts COVID-19.  Ramos, who is thirty-eight years of age, further asserts that he is a non-violent drug offender, has taken productive steps while incarcerated, has family support, and intends to find gainful employment if released.  He contends that he will be an asset to the community and will be under the supervision of Adult Probation and Parole if released.

The Government opposes the motion, arguing that Ramos has no acute medical conditions at this time and, also, poses a danger to the community.  *See* Resp., ECF No. 87.  The Government asserts that releasing Ramos, who has at most a managed medical condition, less than halfway into a 151-month sentence for felony drug offenses would not be appropriate under the § 3553(a) factors and that a reduction would not reflect the seriousness of the offenses, promote respect for the law, or provide just punishment for the offenses.  *See id.* (citing 18 U.S.C. § 3553(a)(2)(A); *United States v. Mathews*, 2020 WL 3498100, at *2 (E.D. Mich. June 29, 2020) ("Drug-related offenses are serious and Defendant has only served 40% of his 151-month sentence.")).

---

[1]  The term of imprisonment was below the Guidelines range of 168 to 210 months of imprisonment.

The Government obtained the most recent medical records of Ramos from the Bureau of Prisons ("BOP") and has attached them to its Response. *See* Records, ECF No. 88. It argues these records establish that Ramos is in good health, without the need for medication or medical care, and engages in activities of daily living. The Government disputes Ramos's allegation that he suffers from a condition that is a CDC[2] risk factor in relation to COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/people-with-medical-conditions.html. The Government, highlighting that Ramos asserts only that he suffers from asthma, recognizes that the CDC lists "moderate to severe asthma" as a condition that "might" pose a risk. However, the Government argues the BOP medical records show that Ramos does not present this condition as he has never sought or received treatment while incarcerated for any asthmatic episode. *See* Resp. 14-15 (citing *United States v. Towel*, No. 17-519-6, 2020 U.S. Dist. LEXIS 98031 (E.D. Pa. June 4, 2020); *United States v. Slone*, No. 16-400, 2020 U.S. Dist. LEXIS 113586 (E.D. Pa. June 30, 2020)).

The Government further states that the BOP has taken significant measures to protect the health of inmates during the COVID-19 pandemic. It explains that the BOP began planning for potential coronavirus transmissions in January, consistent with its Pandemic Influenza Plan that has been in place since 2012. *See* BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (planning for social distancing, cleaning protocols, and the quarantining and treatment of symptomatic inmates). On March 13, 2020, the BOP, working with experts in the CDC, began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-

---

[2] Center for Disease Control ("CDC")

19 transmission into and inside its facilities. *See* BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp. Since that time, the BOP has repeatedly revised the Action Plan to address the crisis. The Government explains that the modified operations plan, *inter alia*, limits movement within and access to all BOP facilities; requires screening of newly admitted inmates, facility staff, and contractors performing essential services or necessary maintenance on essential systems; suspends visitation, while increasing inmates' telephone allowance; and encourages social distancing, the wearing of face masks, and other steps to limit the spread of the virus.

Additionally, the Government notes, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") on March 27, 2020, to enhance the BOP's flexibility to respond to the pandemic by authorizing the BOP to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. *See* Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).[3] On

---

[3] Ramos may not seek release to home confinement in the courts under the CARES Act. Section 12003 of the CARES Act allows *the Director of the Bureau of Prisons* [BOP] to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under" 18 U.S.C. § 3624(c)(2). *See* CARES Act § 12003(b)(2). The "BOP has sole authority to determine which inmates to move to home confinement under 18 U.S.C. § 3624(c)(2)," *see United States v. Ramirez-Ortega*, No. 11-251, 2020 U.S. Dist. LEXIS 148629, at *8 (E.D. Pa. Aug. 14, 2020), and nothing in the CARES Act gives this Court the authority to transfer a prisoner to home confinement, *see* 18 U.S.C. § 3621(b)(5) (stating that the BOP's designation with regard to home confinement "is not reviewable by any court"); *United States v. Pettiway*, No. 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) ("Regardless of the nature of defendant's medical condition or the existence of the coronavirus pandemic, Congress did not provide the courts with the authority to release inmates into home confinement at an earlier time under the CARES Act. This discretion rests solely with the Attorney General and the BOP Director." (internal citations omitted)).

April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of coronavirus transmission. The Government states that since March 26, 2020, the BOP has transferred at least 7,247 inmates to home confinement. It contends that the BOP's aggressive efforts at McKean, where Ramos is incarcerated, have been successful thus far. The institution houses 751 inmates, but has not reported any positive cases of COVID-19 throughout the coronavirus pandemic.

Finally, the Government argues that release is not appropriate because Ramos is a danger. The Government notes that in the above-captioned case Ramos sold drugs on at least two occasions and drugs were seized in a search of his house and vehicle. Drug packaging materials and 9mm ammunition were also seized from his residence. The Government asserts that in addition to the current offenses, Ramos has a significant criminal history involving drugs and violence, for which he received terms of incarceration but was not deterred. Specifically, in 2003, Ramos had four separate convictions: (1) possessing controlled substances; (2) theft, which occurred when he and another individual forced their way into a residence, put a firearm to the head of the man inside, and threatened to shoot him if he did not turn over money and a cell phone; (3) simple assault against his pregnant girlfriend at the time by punching her repeatedly in her face and head with a closed fists causing injury, and damaging her vehicle; and (4) simple assault against the now-mother of his infant child by punching her in her forehead and cheek causing injury, which culminated in Ramos resisting arrest after fleeing from law enforcement. In 2008, Ramos was convicted of possession with intent to distribute cocaine. In 2011, he was convicted of simple assault against his wife by picking her up by her hair and slamming her to the ground, ripping out a chunk of hair. In 2013, he was convicted of disorderly

conduct and thereafter violated probation. Ramos was arrested in the above-captioned action in April 2015. Additionally, Ramos is an admitted member of the Latin King gang.

### III.    LEGAL STANDARD

The First Step Act empowers criminal defendants to request compassionate release with the court after first complying with the exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A).[4] This section dictates that the defendant must first move for compassionate release with the BOP, which then has thirty days to consider the request. *See United States v. Raia*, 954 F.3d 594, 595-97 (3d Cir. 2020) (holding that the risks COVID-19 poses in the federal prison system do not excuse the exhaustion requirement).

Once a defendant satisfies the exhaustion requirement, the court may reduce a term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) if it finds that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). *See also* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). Section 1B1.13 of the United States Sentencing Guidelines provides that the court may reduce a term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A), "if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that . . . extraordinary and compelling reasons warrant the reduction; . . . the defendant is not a danger to

---

[4]   Section 3582(c) is actually part of the Sentencing Reform Act of 1984 ("SRA"), but was amended by the First Step Act to provide prisoners a more direct route to court for their claims. *See United States v. Torres*, No. 18-414, 2020 WL 3498156, at *6 (E.D. Pa. June 29, 2020).

the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and []

the reduction is consistent with this policy statement." 18 U.S.C. Appx. § 1B1.13. The

Sentencing Commission has identified the medical condition of a defendant as an extraordinary

and compelling reason if:

> (i)  The defendant is suffering from a terminal illness . . . .
> (ii) The defendant is—
> > (I)   suffering from a serious physical or medical condition,
> > (II)  suffering from a serious functional or cognitive impairment, or
> > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.*, App. Note 1.

## IV.   ANALYSIS

Initially, the Court finds that Ramos has satisfied the exhaustion requirement by first

seeking compassionate release with the BOP.  However, there are no "extraordinary and

compelling reasons" that warrant a reduction in sentence, Ramos would be a danger if released,

and the factors set forth in 18 U.S.C. § 3553(a) do not support a reduction.

### A.   Ramos's asthma[5] does not present an extraordinary and compelling reason to reduce his sentence.

The BOP medical records reveal that Ramos has no medical needs at this time.  *See*

Records 46 (listing Ramos's only current health problems as opioid use and constipation).

---

[5]   Although there are some indications of high blood pressure in Ramos's BOP medical records, the motion for compassionate release is limited to Ramos's asthma.  Moreover, while the CDC recognizes that people who suffer from hypertension or high blood pressure "might be at an increased risk for severe illness from the virus that causes COVID-19," *see* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, Ramos was not prescribed medication and the medical records state this condition has resolved.  *See* Records at 32, 35, 46; Def. Ex. at 15-20.

Notably, a medical appointment record dated April 1, 2019, reflects that while Ramos claims a history of asthma, he had been asymptomatic for over a year and could not recall the last time he had to use an inhaler.[6] *See id.* at 4. In a medical appointment on May 24, 2019, Ramos denied any medical complications. *See id.* at 1. The records show that the last time Ramos requested a "sick call" at health services was on October 17, 2019; but, he failed to appear for that appointment. *See id.* at 38. The records list his asthma as resolved. *See id.* at 46. They suggest that Ramos is fully ambulatory and engages in normal activities of daily living, *see, e.g. id.* at 34 and 40, which Ramos does not contest in his motion.

While the CDC states that adults of any age with "Asthma (moderate-to-severe)" "might be at an increased risk for severe illness from the virus that causes COVID-19,"[7] Ramos's asthma is not moderate to severe. At most, Ramos's asthma is mild. *See Slone*, 2020 U.S. Dist. LEXIS 113586, at *12 (determining that the records confirmed the prisoner's asthma is mild where he "does not have daily asthma symptoms, use his inhaler daily, or have abnormal lung function[, and] his chest x-ray showed no pulmonary complications"). Accordingly, Ramos is not suffering from a "serious" condition as contemplated by the Sentencing Commission as presenting "extraordinary and compelling reasons" that warrant a reduction in sentence. *See* 18 U.S.C. Appx. § 1B1.13, App. Note 1; *Slone*, 2020 U.S. Dist. LEXIS 113586, at *17 (determining

---

[6]  According to earlier medical records presented by Ramos, he has had an albuterol inhaler (for use in the event of an asthma attack, not daily) since May 22, 2017. *See* Def. Ex. at 14-15, ECF No. 85-1. In January, 2018, Ramos presented with respiratory problems and was diagnosed with an acute respiratory infection. *See id.* at 7-8. The following month he reported managing well with as-needed albuterol and no recent exacerbations. *See id.* at 10-14. Ramos was seen by medical for respiratory complaints again on June 12, 2018, stated that there had been no changes in his asthma, reported that he was doing well on albuterol, and was given a new prescription for an inhaler. *See id.* at 2-4.

[7]  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

that the prisoner's mild asthma did not present an extraordinary and compelling reason warranting his release); *Towel*, 2020 U.S. Dist. LEXIS 98031 (concluding that the prisoner, who did not require daily asthma medication, did not have symptoms that interfered with daily activities, and had normal lung function tests, did not present symptoms of moderate to severe asthma that rose to extraordinary and compelling circumstances warranting his release).

Further, the fact that Ramos was prescribed an albuterol inhaler more than three years ago, but has not presented with any asthma attacks or even requested a sick call for approximately a year, is evidence that his condition is not one "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *See* 18 U.S.C. Appx. § 1B1.13, App. Note 1(A)(ii); *United States v. Williams*, No. 18-335, 2020 U.S. Dist. LEXIS 152687, at *10-11 (W.D. Pa. Aug. 24, 2020) (denying compassionate release because the prisoner's long history of asthma, which is controlled with the use of an albuterol inhaler, "is treatable with medication and the BOP is providing him access to appropriate medical care," which contradicts a finding that his "asthma prevents him from being able 'to provide self-care within the environment of a correctional facility'") (quoting 18 U.S.C. Appx. § 1B1.13, App. Note 1(A)(ii))); *United States v. Pangelinan*, No. 17-483, 2020 U.S. Dist. LEXIS 121710, at *4-5 (E.D. Pa. July 9, 2020) (denying the motion for compassionate release where there was no evidence that the prisoner's medical conditions were not being appropriately managed by the prison). In fact, the records list Ramos's asthma as resolved. *See United States v. Moses*, No. 4:16-CR-00019-14, 2020 U.S. Dist. LEXIS 143540, at *6 (M.D. Pa. Aug. 11, 2020) (concluding that the prisoner was "not entitled to compassionate release based solely on the existence of COVID-19 or his already-resolved infection").

The BOP's efforts to protect the health and safety of inmates at McKean, where Ramos is incarcerated, provide additional grounds to find that extraordinary and compelling reasons have not been presented. McKean houses 751 inmates, but there has not been a single positive case of COVID-19 throughout the coronavirus pandemic. *Accord United States v. Thornton*, No. 2:18-167-1, 2020 U.S. Dist. LEXIS 134434, at *9 (W.D. Pa. July 29, 2020) (rejecting the inmate's generalized concerns for health and safety because although "Elkton has been one of the hardest-hit federal prison facilities in terms of Covid-19. . . . FCI Elkton has shown signs that BOP measures designed to protect inmates"). "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. Similarly, "the COVID-19 pandemic does not warrant the release of every federal prisoner with health conditions that make them more susceptible to the disease." *United States v. Santiago*, No. 15-280, 2020 U.S. Dist. LEXIS 124869, at *7 (E.D. Pa. July 15, 2020).

For all these reasons, Ramos's asthma is not an extraordinary and compelling reason to warrant a reduction in sentence.

**B.    A reduction in sentence would not be consistent with applicable policy statements issued by the Sentencing Commission because Ramos presents a danger to the community if released.**

As previously described, Ramos has a criminal history involving drugs and violence dating back almost twenty years. The facts underlying his simple assault convictions, as well as his theft conviction, are particularly violent and disturbing. Further, Ramos has repeatedly shown a disrespect for authority, as evidenced by his actions in resisting arrest and violating the terms of his probation. Although Ramos's stated intention to obtain gainful employment and

10
102020

become a productive member of the community upon release, as well as his completion of several programs and courses while incarcerated, is commendable, his lengthy criminal history and violations of the terms of his supervision contradict such statement. *See United States v. Brinson*, No. 15-87, 2020 U.S. Dist. LEXIS 146341, at *15-16 (W.D. Pa. Aug. 14, 2020) (considering the defendant's criminal history involving both gun and drug offenses, "the Court cannot confidently conclude that Defendant will not commit similar offenses which will endanger the community if he is released"). Ramos has been committing crimes almost his entire adult life, has not been deterred by prior terms of incarceration, and therefore poses a danger if released. *See United States v. Rodrequis Council*, No. 4:18-CR-00219, 2020 U.S. Dist. LEXIS 158806, at *13 (M.D. Pa. Sep. 1, 2020) (concluding that the defendant, whose criminal conduct has been consistent and dangerous, has not been deterred from prior sentences and presents a danger to the community if released from confinement). Accordingly, a reduction in sentence is not consistent with applicable policy statements issued by the Sentencing Commission. *See United States v. Williams*, No. 15-471-3, 2020 U.S. Dist. LEXIS 147664, at *10 (E.D. Pa. Aug. 17, 2020) ("In order to find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is 'not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)'" (quoting 18 U.S.C. Appx. § 1B1.13(2))).

      **C.**    **The factors set forth in 18 U.S.C. § 3553(a) do not support a reduction in Ramos's sentence.**

The nature and circumstances of the instant offenses weigh against a reduction. In the above-captioned action, Ramos sold methamphetamine on two separate occasions (27 and 15 grams of pure methamphetamine, respectively) and, on a third date, additional methamphetamine (218 grams of pure methamphetamine) and drug packaging materials were seized in a search of

his house and vehicle, which were within 1,000 feet of a school. Thus, Ramos's behavior was not an isolated incident. Further, the drug involved in this case, methamphetamine, is particularly dangerous. *See United States v. Robinson*, No. 19-371, 2020 U.S. Dist. LEXIS 87372, at *14-15 (E.D. Pa. Apr. 21, 2020) ("Methamphetamines as a class of drug are particularly dangerous, because they are stimulants, not sedatives, and can induce paranoia, hallucinations, and violent behavior." (citing National Institute on Drug Abuse, Drug Facts, Revised May 2019, https://www.drugabuse.gov/ publications/drugfacts/methamphetamine)). In fact, Congress has determined that even a fourth of the weight of methamphetamine possessed by Ramos warrants a mandatory ten-year minimum term of imprisonment. *See* 21 U.S.C. § 841(b)(1)(A)(viii) (providing a ten-year mandatory sentence for the possession with intent to distribute 50 grams or more of methamphetamine).

Although the Court is not limited by the mandatory minimum sentence in deciding whether to grant compassionate release, because Ramos has served[8] less than sixty percent of the ten-year mandatory minimum, the need to avoid unwarranted sentence disparities among similarly situated defendants also weighs against a reduction. This conclusion is strengthened by the fact that Ramos originally received a below-Guidelines sentence and has served less than half of that sentence. *See United States v. Daniels*, No. 15-127, 2020 U.S. Dist. LEXIS 144384, at *10 (E.D. Pa. Aug. 12, 2020) (determining that where the defendant had not yet served even half of his 180-month sentence, granting compassionate release would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment for his offense).

For the reasons previously discussed, the history and characteristics of the defendant also weigh against reduction.

---

[8] Ramos has served approximately sixty-five months imprisonment.

For all the reasons discussed herein, the factors set forth in 18 U.S.C. § 3553(a) dictate that a reduction of sentence should not be granted because a reduction would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment.  *See United States v. Rengifo*, No. 1:13-CR-00131, 2020 U.S. Dist. LEXIS 129192, at *6-7 (M.D. Pa. July 22, 2020) (reasoning that the need for adequate deterrence and to protect the public from further crimes counseled against granting the motion for compassionate release because the defendant's current offense was for dealing drugs, he was a gang member, he had a lengthy criminal history spanning decades, and he repeatedly reoffended).

## V.     CONCLUSION

Ramos has filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) due to his asthma and the coronavirus pandemic.  Because his mild asthma does not even require medical attention at this time, he has not presented extraordinary and compelling reasons to reduce the sentence.  Given the seriousness of the instant offenses, as well as Ramos' violent criminal history and the fact that he has not been deterred by prior terms of incarceration, he presents a danger to the community.  Moreover, he has served less than half of his 151-month sentence and a reduction would not be appropriate under 18 U.S.C. § 3553.  The motion for compassionate release is therefore denied.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge